## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 21 2020, 5:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Timothy S. Schafer
Timothy S. Schafer, II
Todd S. Schafer
Schafer & Schafer, LLP
Merrillville, Indiana

ATTORNEYS FOR APPELLEE
SAMARA KESTER, D.O.

Edna M. Koch
Joseph D. McPike, II
Zeigler Cohen & Koch
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
PORTER MEMORIAL HOSPITAL

Marian C. Drenth
Michael E. O'Neill
O'Neill McFadden & Willet LLP
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Doll III, Rebekah Doll, and Amanda Doll,

*Appellants-Plaintiffs,*

v.

Samara Kester, D.O., and Porter Memorial Hospital,

*Appellees-Defendants*

February 21, 2020

Court of Appeals Case No. 19A-CT-663

Appeal from the Porter Superior Court

The Honorable Jeffrey W. Clymer, Judge

Trial Court Cause No. 64D02-0712-CT-11508

**Vaidik, Judge.**

# Case Summary

Robert Doll III, Rebekah Doll, and Amanda Doll ("the Dolls") appeal following a jury verdict in favor of Samara Kester, D.O. ("Dr. Kester") and Porter Memorial Hospital ("the Hospital") in this medical-malpractice action arising from the death of the Dolls' father, Robert Doll II ("Robert"). The Dolls contend that the trial court erred by failing to give certain jury instructions. Finding no error, we affirm.

# Facts and Procedural History

On October 3, 2000, Robert went to the Hospital's emergency room complaining of chest and abdominal pain that had started the day before while he was working on a deck at his house. He was fifty-two years old, weighed 377 pounds, and had a history of hypertension. He was seen by Dr. Kester, an ER doctor. He reported that "he may have strained himself." Hospital's App. Vol. II p. 3. Dr. Kester noted that it "hurt more" if Robert "takes a deep breath or moves around" and if he "lifts his arms up." *Id.* Dr. Kester palpated Robert's chest wall, and the pain was reproduced. She ordered a chest x-ray and interpreted it as "negative." Appellants' App. Vol. II p. 39. Dr. Kester also ordered an EKG and lab work, the results of which she interpreted as normal.

Dr. Kester believed that Robert's pain was confined to his chest wall and stated as much in the discharge instructions: "It appears that your chest pain today is

due to a problem confined to the chest wall, and is not in your lungs or heart."
*Id.* at 45. However, Dr. Kester also instructed Robert to "FOLLOW UP WITH
FAMILY DR IN 2-3 DAYS." *Id.* at 46. In addition, the instructions stated as
follows with regard to x-rays: "If you had x-rays completed, they will be
reviewed by a radiologist. If his interpretation is different from mine, we will
call you as soon as possible at the number you gave to the registration clerk."
*Id.* at 45.

[4] As indicated on the discharge instructions, a radiologist reviewed the chest x-
ray and determined that it showed cardiomegaly—an enlarged heart.[1] Copies
of the radiologist's report were sent to the ER and to Robert's family doctor,
Dr. Kimberly Perry, but according to the Dolls no one from the Hospital
contacted Robert to tell him about the finding of cardiomegaly. No evidence
was presented as to whether Robert did or did not follow up with Dr. Perry as
he had been instructed to do.

[5] Twenty-four days after his visit to the ER, Robert died. His death certificate
lists the causes of death as "Suspected Cardiac Arrhythmia" and
"Artherosclerosis of Coronary Arteries" and under "Other significant

---

[1] This finding by the radiologist was not necessarily inconsistent with Dr. Kester's interpretation of the x-ray
as "negative." At trial, Dr. Kester testified that when ER doctors interpret x-rays, they "look for the acute
process, like a collapsed lung or pneumonia or some other reason why the patient may be having their
symptoms." Tr. Vol. II pp. 56-57. She added, "This patient [Robert] probably had cardiomegaly for years.
Was it an acute thing that I needed to pay attention to at that time? No. My interpretation when I put
negative on there means negative for an acute process." *Id.* at 57. In any event, we assume for purposes of
this appeal that the radiologist's interpretation of the x-ray was "different" than Dr. Kester's.

conditions" lists "Marked Cardiomegaly With Left Ventricular Wall Thickness." *Id.* at 59.

[6] After Robert's death, the Dolls pursued a medical-malpractice claim against Dr. Kester and the Hospital. In the Department of Insurance, a medical-review panel unanimously determined that the evidence does not support the conclusion that Dr. Kester or the Hospital failed to meet the applicable standard of care.

[7] The Dolls then filed a complaint in Porter Superior Court. Dr. Kester and the Hospital initially asserted that Robert was contributorily negligent (for failing to follow up with Dr. Perry) but withdrew that defense shortly before the jury trial. At trial, witnesses described the Hospital's process for dealing with discrepancies between an ER doctor's interpretation of an x-ray and a radiologist's interpretation. The Hospital summarizes this evidence as follows, with no dispute by the Dolls:

> [I]f the radiologist's interpretation differs from the emergency medicine physician's interpretation, the radiology department will send a copy of the radiologist's report to the emergency department and the emergency medicine physician on shift at the time the report is received will review the report. It is the emergency medicine physician's determination whether the discrepancy and the radiologist's read of the report is significant enough to warrant contacting the patient.
>
> If the emergency medicine physician determines that no change in treatment plan is necessary, then a supplemental report will not be completed as no further action or treatment is deemed

necessary. The only time that a supplemental record is created is if the emergency medicine physician determines that a significant discrepancy exists warranting a change in the treatment plan for the patient. In this instance, a supplemental record will be completed, and the emergency medicine physician will direct the charge nurse to have the emergency department contact the patient to advise them of the change in care plan.

Hospital's Br. p. 10. Here, the ER doctor who reviewed the radiologist's report pursuant to this procedure has never been identified. However, there is no supplemental report, which indicates that this second ER doctor did not believe the radiologist's finding of cardiomegaly constituted a significant discrepancy that necessitated a call to Robert.

[8] The defense also presented substantial evidence that the second ER doctor was not negligent in concluding that there was no need to call Robert. Dr. Kester testified that cardiomegaly is not an "acute process" that "needs to be addressed immediately[.]" Tr. Vol. II pp. 56-57, 84-85. Dr. Thomas Gutwein, an ER doctor who served on the medical-review panel, testified that no call was necessary "because the patient had already had arrangement for followup with their family doctor." *Id.* at 137-38. He added:

If they had no where to go, if they did not have a primary care doctor or they were going to be -- they didn't have anybody to prescribe them medications to address any of these issues, then yes. Then you would need it call them [sic] and say, Hey, you absolutely need to make sure you find a family doctor to follow up. They had already asked him to follow up early on with his family doctor who is very well qualified to take care of that problem, to manage that medical condition.

*Id.* at 138. Similarly, Dr. John Miller, an electrophysiologist, when asked whether the Hospital should have notified Robert of the finding of cardiomegaly, answered, "I think the family physician would have gotten this information and that would be a time to have that conversation." *Id.* at 168-69. Dr. Mark Tompkins, another ER doctor, testified that whether to call a patient about a discrepancy is a "judgment call" by the doctor and that he could "see a situation" in which he would not tell a patient about a finding of cardiomegaly and would "let their family doctor handle that[.]" *Id.* at 159, 160.

[9] The Dolls tendered three jury instructions that are the focus of this appeal: one concerning apparent agency, one concerning contributory negligence, and one concerning Robert's pre-existing conditions. The trial court rejected all three instructions, and the jury ultimately returned a verdict in favor of Dr. Kester and the Hospital.

[10] The Dolls now appeal.

# Discussion and Decision

[11] The Dolls contend that the trial court should have given three jury instructions that they tendered. Instructing the jury is a matter within the sound discretion of the trial court. *Pattison v. State*, 54 N.E.3d 361, 365 (Ind. 2016). As such, we review a trial court's decision to give or reject a jury instruction only for an abuse of discretion. *Id.* We look at whether the instruction states the law

correctly, whether it is supported by record evidence, and whether its substance is covered by other instructions. *Id.*

[12] The Dolls first argue that the trial court abused its discretion by failing to give their proposed instruction on apparent agency:

> A hospital is liable for the negligent acts of a physician if the hospital acted or communicated directly or indirectly to the plaintiff in such a manner that would lead a reasonable person to conclude that the physician was an employee or agent of the hospital and that the plaintiff justifiably acted in reliance upon the conduct of the hospital consistent with care and prudence.

Appellants' App. Vol. II p. 79. The Dolls maintain that the second ER doctor was negligent in failing to call Robert after reviewing the radiologist's report, that the doctor was an apparent agent of the Hospital (even if technically an independent contractor), and that therefore the jury should have been instructed that the Hospital could be held liable for the negligence. On the first issue—negligence—the Dolls' theory proceeds as follows: (1) the discharge instructions said Robert would get a call if the radiologist's interpretation of the chest x-ray was different than Dr. Kester's; (2) the radiologist's interpretation of the chest x-ray was different than Dr. Kester's; (3) no one called Robert; and (4) therefore, the second ER doctor was negligent.

[13] The problem with this theory is that it conflates the discharge instructions with the applicable **standard of care**. To be sure, the failure to call was a breach of the discharge instructions. However, that does not mean it was a breach of the standard of care. In other words, while the discharge instructions said that

Robert would get a call if the radiologist's interpretation of the x-ray was at all "different" than Dr. Kester's, the Dolls do not direct us to any evidence that the difference at issue—the finding of cardiomegaly—was of such a nature that the applicable standard of care **required** a call to Robert. As set forth above, the defendants presented extensive expert testimony that the failure to call, under the specific circumstances of this case, was not a breach of the standard of care, regardless of what the discharge instructions said. The Dolls do not direct us to any evidence to the contrary.[2] Because the Dolls do not cite any evidence that the second ER doctor breached the applicable standard of care, we cannot say that the trial court abused its discretion by declining to instruct the jury that the Hospital could be held liable for any such breach. In short, with no evidence of a breach, there was nothing the Hospital could be held liable for, so there was no reason to give the instruction.

[14] Next, the Dolls assert that the trial court abused its discretion by failing to give the jury the Dolls' proposed instruction on contributory negligence: "There is no claim for contributory negligence against Mr. Doll. You cannot place fault on Mr. Doll for anything he did or did not do." Appellants' App. Vol. II p. 85. This was an accurate statement of the law in this case. The defendants initially asserted a claim of contributory negligence but withdrew it shortly before trial. Again, however, the Dolls' argument fails on the second prong—the evidence did not support the giving of the instruction. The Dolls contend that the

---

[2] In fact, the partial transcript provided by the Dolls does not include the testimony of any of their experts.

instruction was necessary because "[t]he defense repeatedly discussed how Mr. Doll was instructed to follow up with his family doctor but did not." Appellants' Br. p. 28. But while the jury heard that Robert was **instructed** to follow up with his family doctor, the Dolls do not point to anything in the record indicating that the jury was ever told that Robert **did not** follow up. Therefore, the trial court did not abuse its discretion by rejecting the tendered instruction.[3]

[15] Finally, the Dolls argue that the trial court abused its discretion by failing to give the following instruction based on Indiana Model Civil Jury Instruction 925 (titled "Defendant Takes Plaintiff as He Finds Him"): "Dr. Kester and Porter Memorial Hospital are not excused from responsibility just because Mr. Doll was overweight and suffered from hypertension, elevated cholesterol and cardiomegaly at the time of his ER visit that made it more likely to experience complications including arrhythmia and sudden cardiac death." Appellants' App. Vol. II p. 84. According to the Dolls, our Supreme Court held in *Cavens v. Zaberdac*, 849 N.E.2d 526 (Ind. 2006), that "an instruction on this issue is required" whenever there is evidence of pre-existing conditions. Appellants' Reply Br. 10. That is a misrepresentation of the holding in *Cavens*. In fact, the

_____

[3] The Dolls also assert that the parties "stipulated" that Robert was not contributorily negligent and that their tendered contributory-negligence instruction was therefore consistent with Indiana Model Civil Jury Instruction 309, which provides for juries to be instructed about stipulations of fact: "The parties in this case have agreed that certain facts are true. You must accept these facts as true: [*insert agreed facts*]." But the defendants did not stipulate that Robert was not contributorily negligent. They simply decided not to pursue a contributory-negligence defense, which explains why they never told the jury that Robert did not follow up with his family doctor.

part of *Cavens* relied on by the Dolls has nothing to do with a jury instruction. The issue was simply whether a defendant doctor could assert a contributory-negligence defense relating to a patient's pre-existing conditions. Our Supreme Court held that he could not. Here, consistent with that holding, the defendants did not assert or seek to assert a contributory-negligence defense based on Robert's pre-existing conditions. The Dolls have failed to establish that they were entitled to the proposed instruction.

[16] Affirmed.

Riley, J., and Bradford, C.J., concur.